**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**FRANKFORT**

| | | |
|---|---|---|
| **TAMMY JACKSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:20-CV-10-GFVT-MAS** |
| | ) | |
| **ETHICON, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION & ORDER**

This matter arises out of a subpoena served on non-party law firm Hughes & Coleman, PLLC seeking materials related to Plaintiff Tammy Jackson's consultation with the firm prior to initiation of this case. Hughes & Coleman resists the document requests on privilege grounds, and Defendants Ethicon, Inc., and Johnson & Johnson (collectively, "Ethicon") move to compel subpoena compliance. For the reasons discussed in this opinion, the Court finds the asserted privilege applicable to some identified documents, but inapplicable to others. Thus, the Court grants in part and denies in part the motion to compel as here outlined. The Court further directs Hughes & Coleman to respond more fully to the subpoena, as discussed *infra*.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Tammy Jackson and her husband, Bryon Jackson, ("the Jacksons") brought suit against Ethicon, Johnson & Johnson, and several other since-dismissed entities in July 2012 as a part of the pelvic mesh multidistrict litigation ("MDL") then pending in the Southern District of West Virginia. [DE 1]. Tammy Jackson alleged that she received a pelvic mesh implant (specifically, a Gynecare TVT device) in May 2007, designed to treat stress urinary incontinence and related conditions. [*Id.*, ¶¶ 60–66]. She further avers that the TVT mesh implant,

1

manufactured and marketed by Ethicon, caused her serious injuries resulting in permanent disability, resulting in significant monetary damages. [*Id.*]. The Jacksons assert several claims against Ethicon stemming from the implant, including failure to warn, strict liability, negligence, breaches of warranties, fraud, and loss of consortium. [*Id.*, ¶¶ 67–110]. The Jacksons further request an award of punitive damages. [*Id.*, ¶¶ 111–113]. At the time of Complaint filing, Plaintiffs were represented by the law firm Skikos, Crawford, Skikos & Joseph, LLP ("Skikos"). [*Id.*, at Page ID # 28].[1]

In August 2017, after significant global discovery in the MDL but before case-specific discovery occurred under the pretrial scheduling order, the case went on the MDL's inactive docket because the parties advised they had agreed to a general settlement. [DE 48]. But the settlement never materialized, and, in February 2020, the Southern District of West Virginia transferred the case to this District for individualized discovery and further case progression. [DE 38, 40]. Per Ethicon, a central defense it intends to pursue is that Kentucky's one-year statute of limitations governing personal injury suits bars the Jacksons' claims. To explore the defense, Ethicon maintains that it requires records related to the Jacksons' first contacts with Hughes & Coleman that are solely in Hughes & Coleman's possession.

Ethicon highlights unclear and arguably inconsistent proof (absent Hughes & Coleman's records) concerning the accrual timing of Plaintiffs' claims, citing a Social Security Disability ("SSD") claim alleging that Tammy Jackson ceased work in February 2011 because of her TVT mesh issues, at least in part. [DE 83-3]. The Social Security application lists Hughes & Coleman as a source of medical information related to the SSD claim, with first contact occurring on an

---

[1] Skikos no longer represents the Jacksons in this matter. [DE 58]. The firm of Wagstaff & Cartmell LLP currently represents Plaintiffs.

unspecified date in July 2011. [DE 83-4]. At her deposition, Tammy Jackson was unable to recall the precise date that she reached out to Hughes & Coleman in July 2011, or to distinguish between her contacts with them concerning her SSD claim and the product liability claims. [*See* DE 83-5]. She did testify that she had signed a contract with Hughes & Coleman in the past but offered no concrete date, and she represented that she had since lost the contract itself. [*Id.*, at Page ID # 859]. Via written discovery responses submitted after Tammy Jackson's deposition,[2] Plaintiffs denied that Tammy Jackson had contacted or signed a contract with Hughes & Coleman on or prior to July 1, 2020, and they clarified that the contract date was in fact September 16, 2011. [DE 83-6, at Page ID # 865–66]. Plaintiffs objected, however, to Ethicon's request for a copy of the contract, asserting that it was not relevant, not proportional to case needs, and privileged. [*Id.*, at Page ID # 866].

In January 2021, Ethicon served a third-party documents subpoena on Hughes & Coleman, specifically requesting:

> Any and all retention agreements and/or engagement agreements between Hughes & Coleman, PLLC and Jackson, including the general purpose of work to be performed, fee arrangement with Jackson, the date of retention, and arrangement for payment and/or advancement of costs.
>
> Any and all client intake questionnaires completed by Jackson.
>
> Any and all invoices, billing records, cost records, and payment receipt records reflecting fees billed for work performed by Hughes & Coleman, PLLC on behalf of Jackson and fees paid by Jackson to Hughes & Coleman, PLLC.
>
> Any document evidencing the referral of Jackson to Skikos, Crawford, Skikos & Joseph LLP.

---

[2] The deposition occurred on July 21, 2020 [*see* DE 83-5, at Page ID # 856], and the Jacksons submitted the relevant written discovery responses on September 25, 2020 [*see* DE 83-6, at Page ID # 867].

[DE 83-1, at Page ID # 820]. Hughes & Coleman objected to the subpoena on behalf of the Jacksons, contending that the sought documents all are protected by the attorney-client privilege. [DE 83-7]. Plaintiffs too objected to the subpoena served on Hughes & Coleman, likewise asserting the attorney-client privilege as their basis. [DE 83-8]. Consequently, Ethicon filed the instant motion to compel Hughes & Coleman's compliance with the document production requests. [DE 83]. Plaintiffs and Hughes & Coleman each objected to disclosure [DE 89, 90], and Ethicon has replied [DE 91]. The motion is ripe for review and resolution.

## II.   LEGAL FRAMEWORK

The parties accurately agree that the Court must apply Kentucky law to resolve the attorney-client privilege claims the Jacksons raise. *See In re Powerhouse Licensing, LLC*, 441 F.3d 467, 472 (6th Cir. 2006) ("In a diversity case, the court applies . . . state law to resolve attorney-client claims.);[3] Fed. R. Evid. 501 (recognizing that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision"); *see also Hoven v. Walgreen Co.*, 751 F.3d 778, 783 (6th Cir. 2014) (noting the salient *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), rule requiring federal courts to apply the substantive law of the forum state in diversity cases, as here).

Kentucky Rule of Evidence ("KRE") 503 governs the Commonwealth's equivalent of the attorney-client privilege (here termed the lawyer-client privilege). It safeguards a client's ability "to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client[.]" Ky. R. Evid. 503(b). KRE 503 extends to communications:

> Between the client or a representative of the client and the client's lawyer or a representative of the lawyer;

---

[3] The Jacksons assert no work product claims, which federal law would govern.

Between the lawyer and a representative of the lawyer;

By the client or a representative of the client or the client's lawyer or a representative of the lawyer representing another party in a pending action and concerning a matter of common interest therein;

Between representatives of the client or between the client and a representative of the client; or

Among lawyers and their representatives representing the same client.

*Id.* The privilege may be claimed by the client, or by the lawyer at the time of the communication on behalf of the client. Ky. R. Evid. 503(c). The Rule further outlines several exceptions to the privilege, such as for communications made in furtherance of a crime or some situations involving joint representation, but the parties do not argue that any enumerated exception applies here. *See* Ky. R. Evid. 503(d). The Kentucky Supreme Court has observed that KRE 503 "bear[s] striking similarities" to the parallel attorney-client privilege enshrined in federal law. *Reynolds v. Wells*, No. 2016-SC-000134-MR, 2016 WL 7330067, at *3 (Ky. Dec. 15, 2016).

Critically, "the privilege 'protects only those disclosures necessary to obtain legal advice which might not have been made absent the privilege and is triggered only by a client's request for legal, as contrasted with business, advice." *Univ. of Kentucky v. Lexington H-L Servs., Inc.*, 579 S.W.3d 858, 864 (Ky. Ct. App. 2018) (quoting *Lexington Pub. Library v. Clark*, 90 S.W.3d 53, 60 (Ky. 2002) (cleaned up)). Determining whether the privilege applies is a two-prong inquiry. "First, the statements must actually be confidential, meaning they are 'not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." *Id.* (quoting *Collins v. Braden*, 384 S.W.3d 154, 161 (Ky. 2012)). Disclosure of a covered to a communication to a third-party may result in waiver of the privilege. *See 3M Co. v. Engle*, 328 S.W.3d 184, 189 (Ky. 2010). "Second, the statements must be made for the purpose

5

of obtaining or furthering the rendition of legal services to the client." *Univ. of Kentucky*, 579 S.W.3d at 864.

"[T]he burden is on the party claiming the privilege to prove that it exists as to the communications so claimed." *The St. Luke Hosps., Inc. v. Kopowski*, 160 S.W.3d 771, 775 (Ky. 2005) (footnote omitted); *accord In re Grand Jury Investigation* No. 83-2-35, 723 F.2d 447, 454 (6th Cir. 1983). *See also Reynolds*, 2016 WL 7330067, at *3 ("[I]t is the proponent's duty to offer sufficient detail to each supposedly privileged document to persuade the court that the information in question is not discoverable."). Though intended to facilitate free and open communication between attorney and client, "the privilege is narrowly construed because it reduces the amount of information discoverable during the courts of the lawsuit." *Carr v. Lake Cumberland Reg'l Hosp.*, No. CV 15-138-DLB-HAI, 2017 WL 5490916, at *2 (E.D. Ky. Nov. 15, 2017) (quoting *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997)); *see id.* (citing *Frankfort Reg'l Med. Ctr. v. Shepherd*, No. 2015-SC-000438-MR, 2016 WL 3376030, at *12 (Ky. June 16, 2016)). "[A] claim of privilege can be defeated by proof by a preponderance of the evidence . . . that the privilege has been waived or that the communication or material is either outside the scope of . . . the privilege[.]" *Stidham v. Clark*, 74 S.W.3d 719, 727 (Ky. 2002). However, once its applicability to the at-issue communication is established, the attorney-client privilege "may not be overcome by a showing of need by an opposing party to obtain the information contained in the privileged communication." *St. Luke Hosps.*, 160 S.W.3d at 777.

One method of establishing by a preponderance of the evidence that a particular communication is outside of the privilege scope is via *in camera* review. "[A] lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the privilege." *Stidham*, 74 S.W.3d at 727 (quoting *United States v. Zolin*, 491 U.S. 554, 572 (1989),

and expressly applying the *Zolin* standard to Kentucky privilege claims). Still, to justify *in camera* review, the party opposing the privilege "must present evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes" the privilege's inapplicability. *Zolin*, 491 U.S. at 572. "[T]he threshold showing to obtain in camera review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged." *Id.* Upon satisfaction of the threshold showing, "the decision whether to engage in in camera review rests within the sound discretion of the trial court[.]" *Stidham*, 74 S.W.3d at 727. In exercising its discretion, the Court should consider

> such factors as the volume of materials the court is asked to review, the relative importance of the alleged privileged materials to the case, and the likelihood that the evidence produced by an in camera review, together with other available evidence then before the court, will establish that the privilege has been waived or that the communication or material is either outside the scope of the privilege or within a specified exception to the privilege.

*Id*.

### III. ANALYSIS

Hughes & Coleman produced a privilege log identifying and describing the documents in its possession that it has deemed responsive to Ethicon's subpoena. [DE 89-1]. The log lists five documents, asserting that all protected by the attorney-client privilege:

> 1. September 9, 2011 – Party Information Needles Screen completed by Hughes & Coleman staff at time of initial call from Tammy Jackson
>
> 2. September 9, 2011 – Case Tab Needles Screen completed by Hughes & Coleman staff at time of initial call from Tammy Jackson
>
> 3. September 9, 2011 – Case Note Needles Screen injury questionnaire completed by Hughes & Coleman staff at time of initial call from Tammy Jackson
>
> 4. September 16, 2011 – Transvaginal Mesh/Slings Fee Agreement signed and dated by Tammy Jackson
>
> 5. October 10, 2011 – Case note indicating letter sent to Tammy Jackson to advise of Skikos as co-counsel

[*Id.*].  The Court discusses each document in turn.

## A.    THE NEEDLES SCREENS[4]

The first three documents—the Party Information Needles Screen, the Case Tab Needles

Screen, and the Case Note Needles Screen—are apparently responsive to Ethicon's request for

client intake questionnaires.  [DE 83-1, at Page ID # 820].  All three were completed on the same

date (September 9, 2011) and ostensibly represent three components of Hughes & Coleman's

initial client screening process.  As a general matter, the Court views the overall intake process as

undoubtedly part of the Jacksons' pursuit of legal assistance from Hughes & Coleman.  *See Coneal*

*v. Am. Com. Ins. Co.*, No. 518-CV-95-TBR-LLK, 2019 WL 4579291, at *8 (W.D. Ky. Sept. 20,

2019) ("Plaintiff clearly communicated the facts to her attorney in the Attorney Screening Form

in the process of seeking legal advice."); *see also Matter of Search of Info. Associated with*

*rickmaike@yahoo.com that is stored at premises controlled by YAHOO! Inc.*, No. 4:15-MJ-00042,

2020 WL 4373447, at *7–8 (W.D. Ky. July 10, 2020), *report and recommendation adopted*, 2020

WL 4369448 (W.D. Ky. July 30, 2020) (observing that under KRE 503 "[c]ommunications

involving an attorney's representatives, including an attorney's support staff," may be privileged

and that the privilege may apply to initial consultations with prospective clients).

However, neither relevant authority nor the record here supports finding all three intake

documents privileged.  Importantly, the privilege "should be narrowly construed" in each case.

*Humphreys, Hutcheson & Moseley v. Donovan*, 755 F.2d 1211, 1219 (6th Cir. 1985).[5]  "[I]t applies

---

[4] Nowhere in the briefing does any party or entity explicitly clarify the "Needles" reference.
It appears, in context, to refer to Hughes & Coleman's intake program or software.  The Court
treats it as such.

[5] Though *Humphreys* centrally analyzed the attorney-client privilege enshrined in the
Labor Management Reporting and Disclosure Act of 1959, in doing so, it compared it with the
traditional attorney-client privilege under federal common law.  The decision is relevant to the
instant inquiry to the extent it illuminates the federal common law standard, as the Kentucky

only where necessary to achieve its purpose[,]" requiring a nuanced parsing of potentially privileged materials. *Fisher v. United States*, 425 U.S. 391, 403 (1976). The attorney-client privilege properly "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Id.* In discerning the privilege's confines in context, the Court looks to the privilege log. As a predicate to determining that the privilege cloaks certain documents, "the privilege log must assure a reviewing court that the documents contain confidential communications related to obtaining legal advice[.]" *Reynolds*, 2016 WL 7330067, at *3. Of course, the category of communications "related to" pursuit of legal advice is somewhat amorphous—it arguably could be broad enough to encompass the entire intake process and all communications made between attorney and client during it, or narrow enough to exclude all but the specific statements or questions within the intake forms that are factually case-specific and truly "might not have been [provided] absent the privilege." Guided by analogous case law and consistently mindful of the privilege's spirit and purpose, the Court hews an appropriately tailored middle ground.

Per the privilege log, the Party Information form includes precisely that—presumably biographical, demographic, contact, and other general, non-case-specific background information about the client. There is no indication or evidence that clients generally, or the Jacksons in particular, would be dissuaded from or reticent to disclose such general personal information absent an attorney-client privilege. The structure of the three Needles components further suggests that this initial Party Information section contains no communications actually related to the pursuit or receipt of case-specific legal advice. Based on a commonsense reading of the log's

Supreme Court has confirmed that the federal and Kentucky attorney-client privileges are substantially similar. *Reynolds*, at 2016 WL 7330067, at *3.

document descriptions and titles, in context, it seems that the third form (the Case Note form) would contain specific information related to the facts of any potential claim. The second form (the Case Tab form), then, likely would contain other case-specific details relating to how the injury occurred, who may have information about it, relevant documentation a party may have in its possession, or any other legal action previously taken as to the incident that caused the injury. With the latter two discrete Needles sections clearly conveying the case-specific details critical to Tammy Jackson's quest for legal advice from Hughes & Coleman, it is more likely than not that the Party Information form communicates no such information. And, a client's identity and basic biographical and contact information, even when contained in an intake questionnaire, falls outside of the privilege scope. *See Humphreys*, 755 F.2d at 1219 ("In general, . . . clients' identities . . . are not deemed privileged."); *id.* ("[T]he attorney-client privilege should be narrowly construed and . . . the attorney-client privilege does not protect the identity of a client except in very limited circumstances.").

As the Kentucky Supreme Court confirmed in the unpublished *Reynolds* case,[6] client intake questionnaires are not automatically and categorically privileged. *Reynolds*, 2016 WL 7330067, at *3 (noting that "[c]lient intake questionnaires are not facially privileged" and that at least one court had characterized them as "often only incident to an attorney's representation and not confidential"). Though the *Reynolds* Court presumed "that privileged information *may* in fact be found in" a party's responses to such a questionnaire, it concluded that the privilege log did not so

---

[6] The Jacksons take issue with *Reynolds*'s (a 2016 Kentucky Supreme Court decision) unpublished status. [DE 90, at Page ID # 901]. But, for their own part, they rely heavily on *Coneal*, an unpublished 2019 slip opinion from the Western District of Kentucky. The Court finds neither materially more persuasive than the other based on originating court or publication status, and certainly none is binding. These cases are helpful and guide the Court's circumstance-specific inquiry only insofar as any factual or analytical parallels assist the court in appropriately placing the at-issue communications along the spectrum of privilege applicability.

establish in that case; thus, the party asserting the privilege had not carried its burden. *Id.* (emphasis added).

A similar conclusion pertains here. The log does not demonstrate that the Party Information form contains privileged communications. Rather, the privilege log in fact indicates the opposite—that the Party Information questionnaire would *not* contain privileged information, given that Hughes & Coleman's Needles platform expressly separates the intake process into distinct biographical, case-specific, and injury-related sections. Accordingly, a preponderance of the available evidence shows that the Party Information form is outside of the attorney-client privilege scope. *See Stidham*, 74 S.W.3d at 727. The privilege's proponents in this case have not carried their burden of persuading the Court otherwise and, indeed, the privilege log itself supports the privilege's inapplicability. The Court thus will compel disclosure of the Party Information Needles Screen.

In contrast, and per the same reasoning, the Court finds that the privilege shields the Case Note and Case Tab Needles Screenings. With mere biographical and contact information—*i.e.*, the client's identifying information and those clerical communications simply incident to the representation request—squarely carved out in their own questionnaire, the privilege log shows that the remaining intake forms surely include the substantive, case-specific factual communications that are critical and central to the representation request. The sort of information the log indicates such forms would contain is precisely what the privilege targets.

The substance of how Tammy Jackson communicated her legal dilemma to Hughes & Coleman in those forms, undoubtedly reflecting her descriptions of the injuries, her views as to the circumstances leading to them, and her perception of the legal problem she faced, is the crux of her effort to obtain legal representation and advice and, ultimately, to build her case with counsel

of choice. *See Coneal*, 2019 WL 4579291, at \*8 (concluding that an attorney screening form was privileged because, in it, the plaintiff clearly "communicated *facts regarding the underlying accident*" for the purpose of securing legal and advice and emphasizing that this scenario embodied "the very situation contemplated by the privilege") (emphasis added). The record demonstrates that the communications contained in the Case Note and Case Tab forms are those quintessentially protected by the attorney-client privilege, and no showing of need for the information can penetrate the privilege shield. Ethicon may pursue the underlying facts from other discoverable sources, but the Court will not compel disclosure of the Case Note or Case Tab intake questionnaires.

Nor does the Court view *in camera* review of the Case Tab or Case Note forms as warranted, in its discretion. The facts do not support a reasonable belief that such review would establish the forms' nonprivileged nature. Ethicon has not pointed to specific, reliable evidence indicating such and satisfying the required threshold showing. In light of the evidence currently available, which in fact strongly supports the privileged nature of the Case Tab and Note questionnaires, the Court does perceive, as a threshold matter, any meaningful likelihood that *in camera* review would establish that these communications are outside of the privilege's scope. *See Stidham*, 74 S.W.3d at 727.

Ultimately, the privilege log in this case and the record as a whole permit—indeed, require—the Court to dissect the identified document sets with a scalpel, separating mere identification data from substantive communications about the underlying legal problem. Analogous case law supports such careful delineation along this line. The Court eschews any broad or generic privilege finding as to client intake questionnaires, generally. The key is communication content, insofar as the privilege log and other evidence illuminates it, and the Court narrowly tailors the result here accordingly. The record supports compelling disclosure of the

nonprivileged Party Information Needles Screen but declining to compel disclosure of the privileged Case Tab and Case Note Needles Screens.

The Court thus **GRANTS in part** and **DENIES in part** Ethicon's motion to that extent.

**B.      THE FEE AGREEMENT**

In response to the subpoena, Hughes & Coleman also identified a fee agreement governing Tammy Jackson's retention of the firm in relation to the pelvic mesh matter.  Foundationally, the fact of representation and the attorney fee arrangement are not themselves privileged.  *See Humphreys*, 755 F.2d at 1219 (noting that attorney's fees are not privileged); *Reynolds*, 2016 WL 7330067, at *3 ("reaffirm[ing] that the mere fact of representation is not privileged"); *see also In re Grand Jury Subpoena*, 204 F.3d 516, 520 (4th Cir. 2000) (quoting *In re Shargel*, 742 F.2d 61, 63 (2d Cir. 1984) (explaining that communications revealing only "fee information stand on a footing different from communications intended by the client to explain a problem to a lawyer in order to obtain legal advice").  The Jacksons concede that the underlying facts of the general representation nature and of the fee agreement are discoverable, but, relying on *Coneal*, argue that Ethicon must discover them in some manner other than through the fee agreement document.  *See* 2019 WL 4579291, at *10 ("Defendant is entitled to the amount of the fee and the general nature of the representation, but not the communications contained in the contingency fee agreement.").

The *Coneal* decision, however, does not clarify its basis for treating the fee agreement communications there at issue as presumptively privileged; rather, the analysis proceeds from the default position that the fee agreements (and engagement letter) contained privileged communications, without explaining how or why the court concluded that any communications within those particular documents were in fact made for the purpose of obtaining legal advice in a manner contemplated by the privilege.  *See, Coneal*, 2019 WL 4579291, at *11 (referencing the fee agreements at issue as among those that "clearly fit within the scheme" contemplated by KRE

503 and developed by Kentucky law). As it pertains to the specific fee agreement document at issue here, the Court is unable to adopt such a premise.

Like the federal attorney-client privilege, Kentucky's variant is fundamentally intended to preserve clients' willingness to share information freely and honestly with their lawyers so that lawyers may offer complete and accurate advice, furthering the overall goal of administering justice. *See Univ. of Kentucky*, 579 S.W.3d at 864 (characterizing the privilege as essential to protect "disclosures necessary to obtain legal advice which might not have been made absent the privilege"); *accord Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (observing that the privilege promotes "full and frank communication between attorneys and their clients" and, as a result, too promotes "broader public interests in the observance of law and the administration of justice"); *Reed v. Baxter*, 134 F.3d 351, 356 (6th Cir. 1998) ("[T]he privilege encourages clients to make full disclosure to their lawyers, and [a] fully informed lawyer can more effectively serve his client.") (internal quotation marks omitted).[7] Consequently, a faithful application of the privilege centers on the purpose of the communication, based on the available proof of its content, and its role in the client's overall pursuit of legal advice. As *Coneal* recognized, the primary question is ultimately whether "the '*dominant purpose*' [of the communication] was transmission to an attorney for rendition of legal services[.]" 2019 WL 4579291, at *11 (quoting *Haney v. Yates*, 40 S.W.3d 352, 354-55 (Ky. 2000)) (emphasis added).

---

[7] The Court does not join *Coneal* in its wholesale rejection of all cases discussing the federal common law attorney-client privilege, *see* 2019 WL 4579291, at *9 n.16, given the Kentucky Supreme Court's clear view (albeit expressed in unpublished *Reynolds*) that the federal and Kentucky standards are strikingly similar. The Kentucky and federal privileges have similar aims, and law framing the federal inquiry at times offers helpful, though not binding, guidance in application of its Kentucky counterpart.

Based on the privilege log and Plaintiffs' arguments here, without any additional evidence of the fee agreement's particular contents, the Court cannot conclude that it contains privileged communications. As discussed, the fact of representation and the attorney's fee are facially nonprivileged details. It follows that any communication or document that contains this information alone—and nothing else that would have been intended to facilitate substantive legal advice—is, correspondingly, nonprivileged. Based on the document title in the privilege log (all that is known about the fee agreement document, on this record), the Court finds nothing establishing or even suggesting that the document contains anything beyond the fact of representation and the accompanying payment structure. Indeed, the "Fee Agreement" title provided indicates that it comprises only those nonprivileged elements.

Though fee agreements are undoubtedly critical to establishing and structuring the legal representation relationship, they are accurately characterized—like the exchange of basic identification or contact information—as incidental to the actual exchange of legal advice or disclosures necessary to render such advice. *Cf. Coneal*, 2019 WL 4579291, at \*11 (concluding that a document other than a fee agreement was nonprivileged because its "dominant purpose" was "not to secure specific legal advice or a discussion of a specific legal issue"). The privilege log does not show that the fee agreement's "purpose" was to facilitate legal advice. Accordingly, the Court finds the second prong of the privilege test unmet, and Plaintiffs' burden of establishing privilege applicability unsatisfied. *See Reynolds*, 2016 WL 7330067, at \*3 ("Reynolds must do more than simply provide document titles and declare the entirety of their contents privileged. The types of forms involved in this case themselves are not per se privileged, so we need some explanation of the substantive contents before we can authoritatively find the documents not discoverable."); *id.* (emphasizing the "presumption against privileged evidence" and stating:

"Reynolds has offered us no basis for concluding that the contents of the contract include anything beyond a mere declaration of representation between Reynolds and his counsel—a fact that is not a confidential communication nor within the scope of KRE 503.").

The Court thus **GRANTS** Ethicon's motion to compel disclosure of the fee agreement.

C.     THE SKIKOS REFERRAL CASE NOTE

Lastly, the Court considers the case note in Tammy Jackson's file with Hughes & Coleman indicating that the firm had sent her a letter discussing Skikos's retention as co-counsel.[8] There is negligible evidence in the record about the substance, length, or purpose of the case note. The parties do not dispute that the communication is between parties covered by KRE 503; the question, rather, is whether the communication's dominant purpose is to obtain legal advice about the Jacksons' case. Plaintiffs devote relatively little argument to the case note, but they argue that it was "made for the purpose of facilitating the pursuit of the Jacksons' lawsuit and to secure additional counsel to litigate it." [DE 90, at Page ID # 902].

The Court views this cursory contention as inadequate to demonstrate that the privilege applies to the note. Based only on the brief description in the privilege log, it seems likely that the central purpose of the case note was simply to document the transmission of correspondence to the Jacksons indicating that Skikos would be joining as co-counsel. This appears to be only a record-keeping mechanism denoting a procedural step in the case. It is not at all clear, on the current record, that the case note contained any communication that either constituted legal advice or that was made for the purpose of facilitating such advice. *See Coneal*, 2019 WL 4579291, at *11 (finding letters between the plaintiff and a firm relating to specific counsel selection nonprivileged because the "dominant purpose of these underlying communications was the

---

[8] Hughes & Coleman has not identified the letter itself in the at-issue privilege log, and no party addresses it.

selection of a law firm[,]" wherein the plaintiff "made a choice of lawyers, not a choice of strategy that [was] protected from disclosure by the privilege").

As emphasized throughout, it is Plaintiffs' burden to demonstrate privilege application. *St. Luke Hosps.*, 160 S.W.3d at 775; *Collins*, 384 S.W.3d at 164 (finding that the privilege's proponent had not met its burden where, "[w]ithout more certainty about the content of [the] documents, a reviewing court [could not] determine whether any statements [were] even in the documents or whether any statements [were] covered by the privilege").[9] On this record, they have not met their burden. The Court thus **GRANTS** Ethicon's motion to the extent it seeks compelled disclosure of the case note.

**D.     PRIVILEGE LOG SUPPLEMENTATION**

In its reply, Ethicon additionally challenged the privilege log's omission of any documents responsive to the subpoena's requests that related to Tammy Jackson's SSD claim. [DE 91]. Ethicon has presented some evidence that such documents may exist. Tammy Jackson testified that her initial consultation with Hughes & Coleman related to the SSD claim. [DE 83-5, at Page ID # 858–59]. Thus, the record offers some support that Hughes & Coleman may have documentation in its possession that is both responsive to the subpoena and related to the SSD claim, rather than the products liability suit.

The record further supports the potential relevancy of documentation pertaining to the SSD claim. Tammy Jackson's SSD application identifies her TVT mesh implant as the source of her disability and the reason for her inability to continue working. [DE 83-3, 83-4]. The Federal Rules permit parties to "obtain discovery regarding any nonprivileged matter that is relevant to any

---

[9] The *Collins* Court suggested *in camera* review, among other tactics, as a potential method of establishing privilege entitlement. Plaintiffs have not requested *in camera* review and, indeed, vigorously oppose it.

party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The threshold for establishing base relevance for Rule 26 purposes is particularly low. *See, e.g., Herriges v. Cty. of Macomb*, No. CV 19-12193, 2020 WL 4726940, at *2 (E.D. Mich. Aug. 14, 2020) (emphasizing the "extremely low bar for showing relevance" under Rule 26(b)) (quotation marks omitted). Ethicon has fairly established that documentation in Hughes & Coleman's possession concerning the timing of their SSD discussions with Tammy Jackson centering on her mesh implant, if such records exist, could be relevant to its statute of limitations defense. Plaintiffs have not disputed the relevancy of such documents, nor have they asserted any proportionality arguments as to them. And, as noted, the privilege log fails to identify any SSD documents as privileged.

Accordingly, the Court will order Hughes & Coleman to produce any nonprivileged documents related to its SSD contacts with the Jacksons that are responsive to Ethicon's subpoena. To the extent Hughes & Coleman or Plaintiffs perceive any responsive documents as privileged, they should produce a privilege log demonstrating privilege applicability. If disputes arise, the parties may seek further judicial guidance.

## IV.    CONCLUSION

As thoroughly discussed in this Opinion, the Court **ORDERS** as follows:

1.    The Court **GRANTS** DE 83 insofar as it seeks the Party Information Needles Screen, the Transvaginal Mesh/Slings Fee Agreement, and the case note regarding the Skikos referral letter, and it **COMPELS** production of those identified documents (Privilege Log Entry Nos. 1, 4, and 5);

2.    The Court **DENIES** DE 83 insofar as it seeks the Case Tab Needles Screen and the Case Note Needles Screen (Privilege Log Entry Nos. 2 and 3); and

3.      The Court **ORDERS** Hughes & Coleman to respond more fully to Ethicon's subpoena; the firm shall produce all responsive and nonprivileged documents related to the SSD claim.  To the extent Hughes & Coleman claims that any responsive document is privileged, it shall produce an adequate privilege log.

The undersigned enters this Memorandum Opinion pursuant to 28 U.S.C. § 636(b)(1)(A). Within fourteen (14) days after being served with a copy of this Memorandum Opinion, either party may appeal this decision to the presiding District Judge pursuant § 636(b)(1)(A) and FED. R. CIV. P. 72(a).

Entered this 25th day of May, 2021.

Signed By:
Matthew A. Stinnett  *MAS*
United States Magistrate Judge